UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

TYSON POULOS,

               Plaintiff,

      -v-                                  No.14CV3023-LTS-HBP

CITY OF NEW YORK et al.,

               Defendants.
--------------------------------------------------------x

<u>MEMORANDUM OPINION AND ORDER</u>

          In this action, Plaintiff Tyson Poulos ("Plaintiff") brings claims against the City

of New York ("the City"), New York City Police Department ("NYPD") Commissioner William

Bratton, New York City Department of Correction ("DOC") Commissioner Joseph Ponte, Police

Officers Jamel Brown ("Brown") and Juana Ortiz ("Ortiz"), Correction Officers Gordon,

Gregory Jerrick and Patricia Thompson, and inmate Christopher McFadden ("McFadden"),

pursuant to 42 U.S.C. § 1983, Title II of the American with Disabilities Act ("ADA"), et seq.,

and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.[1]  Plaintiff also asserts several New

York state law causes of action, including harassment, intimidation, assault and battery;

conspiracy; negligence; violations of the New York Constitution, Article 15 of the New York

State Executive Law, Section 40 et seq. of the New York State Civil Rights Law, New York

State Corrections Law, and Sections 8-107 et seq., 8-502 et seq., and 8-603 et seq. of the

Administrative Code of the City of New York; negligent hiring, training, supervision and

retention; failure to provide medical treatment; intentional and negligent infliction of emotional

---

[1]        Commissioners Bratton and Ponte are sued in their official capacities.  Police
Officers Brown and Ortiz, and Correction Officers Gordon, Jerrick and
Thompson are sued in both their official and individual capacities.

distress; failure to protect; false arrest and imprisonment; and prima facie tort.  The Court has

jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

Before the Court is the motion of the City, Commissioners Bratton and Ponte, and

Correction Officers Gordon, Jerrick and Thompson (collectively, the "Moving Defendants") for

partial dismissal of Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure

12(b)(6).   The Moving Defendants assert that: (1) Plaintiff has failed to state a federal law claim

against the City for municipal liability; (2) Plaintiff has failed to state a failure to protect claim;

(3) Defendants are entitled to qualified immunity; (4) Plaintiff has failed to allege the personal

involvement of Bratton and Ponte in the commission of a constitutional violation; (5) Plaintiff

has failed to state Section 1985 and 1986 conspiracy claims; (6) Plaintiff has not stated a viable

claim under the Americans with Disabilities Act ("ADA") or the Rehabilitation Act; (7) Plaintiff

has failed to state a deliberate indifference to medical needs claim; (8) all of Plaintiff's claims

pertaining to his time in DOC custody are barred by the Prison Litigation Reform Act ("PRLA");

and (9) Plaintiff has failed to state a claim for intentional or negligent infliction of emotional

distress.  For the reasons stated below, the Moving Defendants' motion is granted in part and

denied in part.


BACKGROUND[2]

On or about May 4, 2013, Plaintiff was arrested by NYPD officers, processed at

the 90th Precinct and transferred to Kings County Central Booking ("Central Booking").  (Am.

Compl. ¶ 64.)  While Plaintiff was in NYPD custody, he repeatedly requested medical attention

---

[2]      The facts recited herein are drawn from the Amended Complaint ("Am. Compl.")
(see Docket Entry No. 15) and are presumed to be true for the purposes of the
instant motion practice.

and permission to use a restroom outside of his holding cell, as he was experiencing a panic attack stemming from agoraphobia and withdrawal symptoms.  (Am Compl. ¶¶ 65-68.)  These requests were denied by Defendant Brown, and Brown ridiculed Plaintiff in response to his requests.  (Id. ¶¶ 66-68.)  On the evening of May 5, 2013, following subsequent requests for medical accommodation, Brown opened the door to the holding cell, wrapped an unknown object in his hand and struck Plaintiff, causing Plaintiff to lose consciousness and suffer serious physical injuries, including an open wound measuring three inches long and two centimeters deep above his right eyebrow.  (Id. ¶¶ 69, 86, 89.)  Plaintiff asserts that, at the time of the alleged attack, he was not a threat to Brown and claims that no reasonable officer would have perceived him as such, that Brown did not attempt to defuse the situation by employing verbal warnings or other non-contact control techniques, and that Brown purposely entered the cell with the intent to harm him.  (Id. ¶¶ 72-74.)  Plaintiff was denied access to medical care by Defendant Brown and other NYPD agents for approximately three hours and, when paramedics arrived, Defendants Brown and Ortiz obstructed their efforts to provide Plaintiff with medical care and transport him to a hospital.  (Id. ¶¶ 84-85.)  Plaintiff further alleges that the NYPD and its employees, including Brown and Ortiz, conspired to cover up the unlawful conduct by filing false disciplinary reports against him.  (Id. ¶ 90.)[3]

Plaintiff was transferred into DOC custody on May 7, 2013, and was assigned to the Anna M. Kross Center on Rikers Island on or before May 13, 2013.  (Id. ¶¶ 93-94.)  On May 13, 2013, at approximately 7:00 p.m., Plaintiff was talking on the phone when an unknown

---

[3]     On June 17, 2015, the Court granted Plaintiff's motion for a default judgment against Brown with respect to the issue of liability on certain claims.  (See Docket Entry No. 51.)  The Court reserved the determination of damages for the trial of this action.

inmate – allegedly known to DOC officers and staff as a member of the Bloods prison gang –

approached Plaintiff and threatened to pour hot water on him if he did not end his call.  (Am.

Compl. ¶ 95-96.)  Defendants Gordon, Jerrick and/or Thompson allegedly witnessed the

confrontation and ordered the unknown inmate to return to his bunk.  (Id. ¶ 97.)  As the unknown

inmate retreated, Gordon, Jerrick and Thompson called to him, "white boy [Plaintiff] will fuck

you up!" and made similar statements, provoking the unknown inmate to return and strike

Plaintiff in the head approximately ten times.  (Id. ¶ 98-99.)  Gordon, Jerrick and/or Thompson

then intervened by administering chemical agents.  (Id. ¶ 100.)  Following this incident,

Defendants Gordon, Jerrick and/or Thompson failed to properly decontaminate Plaintiff "as

required by law and DOC Directive."  (Id. ¶ 103.)  Plaintiff alleges, inter alia, that the force used

was excessive and "grossly disproportionate to the circumstances then and there existing," and

claims to have suffered physical, emotional and psychological injuries as a result of this incident

(hereinafter the "May 13th incident").  (Id. ¶ 101.)

       On or before July 5, 2013, Plaintiff was assigned by DOC to AMKC, 1 Main, on

Rikers Island, along with Defendant McFadden.  (Id. ¶ 108-09.)  Prior to July 5, 2013, Defendant

McFadden had been involved in at least two violent altercations with other prisoners and/or

DOC officers and staff, and the DOC and its employees were aware of the incidents.  (Id. ¶ 110.)

On or about July 5, 2013, McFadden approached Plaintiff while he was on the telephone,

punched him several times in the face, and was quickly pulled away by DOC officers and staff,

preventing Plaintiff from sustaining significant physical injuries.  (Id. ¶ 111.)  Following this

incident, Plaintiff and McFadden were removed to the Booking Office and confined in separate

cells, where McFadden threw food at Plaintiff and continued to threaten him.  (Id. ¶ 112.)  As a

result, a DOC supervisor instructed "an officer or staff member" to reassign Plaintiff and

McFadden to separate housing areas, noting that "McFadden was likely to start another fight with Plaintiff should he ever see him again."  (Am. Compl. ¶ 112.)  Plaintiff was reassigned to Dorm 18 West Upper, and McFadden was relocated to a different housing area.  (Id. ¶ 113.)  Approximately twelve hours later, unspecified "DOC officers" inexplicably modified McFadden's housing assignment and relocated him to Plaintiff's housing area in Dorm 18 West Upper.  (Id. ¶ 114.)  Upon entering the dorm, McFadden approached Plaintiff as he slept and began to punch him repeatedly in the head and face, causing Plaintiff to suffer significant injuries, including three jaw fractures.  (Id. ¶ 115.)  Plaintiff requested medical treatment following the attack (hereinafter the "July 6th incident"), but unknown DOC officers (the "John Doe" Correction Officer defendants) delayed and/or failed to make arrangements for adequate medical care for nearly twelve hours.  (Id. ¶ 116-17.)

Plaintiff was eventually removed to Bellevue Hospital Center ("Bellevue"), where he remained for over a week and underwent surgery and implantation of plates and screws.  (Id. ¶ 119.)  Upon discharge from Bellevue on or about July 13, 2013, Plaintiff was assigned by DOC to 16 Upper at AMKC – the same housing area as McFadden – causing Plaintiff to fear for his safety until the DOC transferred Plaintiff later that same day.  (Id. ¶ 120.)  Despite medical orders from Bellevue personnel to continue with pain medications and a puree diet upon Plaintiff's return to DOC custody, the DOC discontinued the necessary medications and dietary accommodations and follow up care.  Plaintiff's injuries significantly affect his ability to breathe, speak, chew and eat.  (Id. ¶ 121-23.)

<u>DISCUSSION</u>

<u>Motion to Dismiss Standard</u>

"To survive a motion to dismiss [under Federal Rule of Civil Procedure 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (internal quotations, marks and citations omitted). The facial plausibility requirement is satisfied when the factual content in the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> (citing <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 556 (2007)). A complaint containing only "naked assertions" or "a formulaic recitation of the elements of a cause of action" will not suffice. <u>Twombly</u>, 550 U.S. at 555. In making its Rule 12(b)(6) determinations, the Court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference . . . and documents possessed by or known to the plaintiff and upon which [he] relied in bringing the suit." <u>ATS Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d Cir. 2007). Furthermore, in deciding a Rule 12(b)(6) motion, a court assumes the truth of the facts asserted in the complaint and draws all reasonable inferences from those facts in favor of the plaintiff. <u>See</u> <u>Harris v. Mills</u>, 572 F.3d 66, 71 (2d Cir. 2009).

<u>Prison Litigation Reform Act</u>

Moving Defendants seek the dismissal of all claims based on acts alleged to have occurred while Plaintiff was in DOC custody, asserting that such claims are barred by the Prison Litigation Reform Act ("PLRA"). (Memorandum of Law in Support of Defendant's Motion to Dismiss ("Def. Memo") at p. 21.) The PLRA requires that prisoners exhaust all available prison grievance procedures prior to suing in federal court. <u>Jones v. Bock</u>, 549 U.S. 199, 202 (2007)

(citing 42 U.S.C. § 1997(e)).  However, "failure to exhaust is an affirmative defense under the PRLA, and . . . inmates are not required to specially plead or demonstrate exhaustion in their complaints."  549 U.S. at 216.  Plaintiff's Amended Complaint does not address the issue of exhaustion at all, and nothing in that pleading precludes the possibility that Plaintiff exhausted the remedies, if any, that were available to him.  Defendants must plead and, at an appropriate time, prove Plaintiff's failure to exhaust all grievance procedures.  Accordingly, dismissal of Plaintiff's claims on exhaustion grounds is unwarranted at this juncture.

Municipal Liability

Plaintiff asserts his damages claims for constitutional violations against the City and against the Commissioner Defendants in their official capacities, as well as against the Police and Correction Officer Defendants in their individual capacities.  Municipalities cannot be held liable for constitutional violations under the doctrine of respondeat superior.  Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 659 (1978) ("Monell").  "It is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  Monell, 436 U.S. at 694.  Failure to train personnel properly may also provide a path to municipal liability when "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  City of Canton, Ohio v. Harris, 489 U.S. 378, 390 (1989).  In other words, "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality – a 'policy' as

defined by our prior cases – can a city be liable for such a failure under § 1983."  <u>City of Canton</u>,
489 U.S. at 389.  Additionally, "the identified deficiency in a city's training program must be
closely related to the ultimate injury."  <u>Id.</u> at 391.  "That a particular officer may be
unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's
shortcomings may have resulted from factors other than a faulty training program."  <u>Id.</u> at
390-91.

   The Moving Defendants argue that Plaintiff's Section 1983 claims against the
City under 42 U.S.C. § 1983 should be dismissed because the Amended Complaint contains
nothing more than conclusory allegations regarding the existence of a policy or practice that
caused the alleged violations of Plaintiff's constitutional rights.  Plaintiff alleges a pattern of
inadequate investigation into complaints of civil rights violations, tolerance of prisoner-on-
prisoner and officer-on-prisoner brutality, denial or deliberate delay of medical care, and a "code
of silence" that promotes the insulation of officers from punishment for misconduct, of which
supervisory staff within the NYPD and DOC are allegedly aware and that is so pervasive and has
been tolerated for so long as to rise to the level of official policy.  (Am. Compl. ¶¶ 187-208.)
Plaintiff asserts that there are entrenched cultures of the use and tolerance of excessive violence
and neglect of medical needs, cover-ups and upper echelon officials turning a blind eye to
misconduct, such that violators do not fear any adverse consequences.  (<u>Id.</u>)  To support these
contentions, the Amended Complaint references a report issued by the United States Attorney's
Office for the Southern District of New York ("DOJ Report") detailing the treatment of
adolescent male inmates at DOC jails on Rikers Island from 2011 through 2013.  (<u>See</u> U.S.
DEP'T OF JUSTICE, <u>CRIPA Investigation of the New York City Department of Correction Jails on
Rikers Island</u>, at pp. 1-2 (2014)).  Though chiefly concerned with treatment of inmates between

the ages of 16 and 18, the DOJ Report states that "[the] investigation suggests that the systemic

deficiencies identified . . . may exist in equal measure at other jails on Rikers [Island]."  (See

DOJ Report at pp. 1-2.)

The DOJ Report contains information that supports Plaintiff's allegations of

established DOC practices that severely infringe on inmates' civil rights, stating that "systemic

deficiencies" include excessive use of force and inadequate reporting and investigation of, and

discipline resulting from, the use of such force.  (See id. at p. 4.)  The DOJ Report also makes

note of a separate report issued by the Department of Health and Mental Hygiene ("DOHMH")

in late 2013, which found that 45 inmates reported that DOC staff interfered with their efforts to

seek medical treatment, or otherwise retaliated against them, following a use of force incident.

(See id. at pp. 23 n.22.)  The DOJ Report explicitly states that inadequate training is one

systemic deficiency contributing to the excessive use of force (see id.), and recommendations in

the DOJ Report are largely directed at improving training programs, indicating that many of the

listed deficiencies correlate to a failure to properly train DOC personnel.  (Id. at pp. 53-63.)

Taken as true for the purposes of this motion practice, the content of the DOJ

Report provides support for inferences that a policy of using excessive force against inmates on

Rikers Island exists, that reporting on the use of such force is faulty, and that deliberate delays in

the provision of medical care occur regularly, all of which may in part be attributable to the

City's failure to adequately train DOC personnel.  For this reason, the Amended Complaint

contains sufficient plausible factual allegations to support Plaintiff's municipal liability claims

with respect to alleged constitutional violations by DOC personnel.[4]

_____

[4]      The authorities cited by the Moving Defendants in support of their argument that
reliance on the DOJ Report at the pleading stage is inappropriate are inapposite.
Hill v.City of New York and Shaw v. City of New York addressed the

No such pertinent investigative information is, however, proffered regarding the

NYPD.  Plaintiff offers only an article regarding potential NYPD misconduct in the chokehold

death of Eric Garner in July 2014, including statements from Commissioner Bratton that the

NYPD "need[s] to do a lot more . . . in the area of training."  (See Jamie Schram & Aaron Feis,

Bratton: NYPD Cops Will be Re-trained in the Use of Force, N.Y. POST (July 22, 2014, 7:36

PM) http://nypost.com/2014/07/22/bratton-all-cops-will-be-re-trained-in-use-of-force.)  While

the article notes that Commissioner Bratton has acknowledged a need in the NYPD for improved

training on the use of force, his statements arise from conduct that is easily distinguishable from

that alleged here.  Given that Plaintiff must allege facts indicating a deficiency in policy that is

closely related to his injuries in order to demonstrate a basis for liability under Monell,

Plaintiff's municipal liability claim must be dismissed insofar as it is premised on liability for

actions of NYPD personnel.


Personal Involvement of Defendant Commissioners Bratton and Ponte

Because the Commissioner Defendants, neither of whom was in office when the

events underlying Plaintiff's claims occurred,[5] are sued only in their official capacities, and

---

admissibility of investigative reports as trial proof, and neither involved the trial
of a Monell claim.  No. 03CV1283-ARR-KAM, 2007 WL 1989261 (E.D.N.Y.
2007); No. 95CV9325-AJP, 1997 WL 187352 (S.D.N.Y. 1997).  Iouldacheva v.
City of New York addressed an effort to use such a report to establish standing to
sue the Patrolmen's Benevolent Association, No. 02CV10323, 2004 WL 1098678
(S.D.N.Y. 2004), and Domenech v. City of New York involved the invocation of
a report concerning police corruption in opposition to summary judgment motion
practice in an employment discrimination case.  919 F. Supp. 702 (S.D.N.Y.
1996).

[5]     Plaintiff was allegedly assaulted and denied accommodations for his disability
during the Spring and Summer of 2013.  The court takes judicial notice that the
Defendant Commissioners were appointed to their respective offices by Mayor

Plaintiff seeks only damages (for which the City would be responsible) as relief, the foregoing

discussion is dispositive of the viability of the claims against them.  Plaintiff's claims against

Police Commissioner Bratton will be dismissed for failure to state a claim.  Plaintiff's Section

1983 claim against Commissioner Ponte will be dismissed as duplicative of his municipal

liability claim.  Furthermore, because the Court recognizes that Plaintiff has not pleaded any

facts tending to demonstrate Commissioner Ponte's personal involvement in any of the

violations asserted in his Complaint, Plaintiff's claim for deliberate indifference to medical

needs as against Commissioner Ponte must be dismissed.  The Court need not address the

parties' other arguments regarding the Commissioners (or their predecessors') personal

involvement in the alleged constitutional violations.


Qualified Immunity for Defendants Gordon, Jerrick and Thompson

The Moving Defendants seek the dismissal of Plaintiff's Section 1983 claims

against Gordon, Jerrick and Thompson, which arise from the May 13th incident in which these

Defendants allegedly provoked an unknown inmate to attack Plaintiff, on grounds of qualified

immunity.  The doctrine of qualified immunity ensures that officers are on notice that their

conduct is unlawful before they can be subjected to suit.  Hope v. Pelzer, 536 U.S. 730, 739

---

DeBlasio, who was elected in November 2013 and took office in January 2014.
See Michael Barbaro & David W. Chen, De Blasio is Elected New York City
Mayor in Landslide, N.Y. TIMES (Nov. 5, 2013),
http://www.nytimes.com/2013/11/06/nyregion/de-blasio-is-elected-new-york-city
-mayor.html; see also J. David Goodman, Bratton to Lead New York Police for
Second Time, N.Y. TIMES (Dec. 5, 2013),
http://www.nytimes.com/2013/12/06/nyregion/william-bratton-new-york-city-pol
ice-commissioner.html; see also Michael Winerip, De Blasio Setting Up a Test:
Prisoner Reformer vs. Rikers Island, N.Y. TIMES (April 4, 2014),
http://www.nytimes.com/2014/04/05/nyregion/joseph-ponte-new-yorks-new-corr
ections-commissioner-faces-challenge-at-rikers.html.

(2002).  The Supreme Court has articulated a two-pronged test for determining whether an official is entitled to qualified immunity: (1) do the Plaintiff's allegations, if true, frame a constitutional violation, and (2) if so, did the officials violate "clearly established statutory or constitutional rights of which a reasonable person would have known?"  Saucier v. Katz, 533 U.S. 194, 201 (2001).  While the Supreme Court has since held that the sequential approach set out in Saucier is not mandatory, it nonetheless provides a useful rubric for making qualified immunity determinations.  Pearson v. Callahan, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

Here, it is useful to take up, first, the question of whether Plaintiff's claims implicate a clearly established right.  "Where a prison inmate has alleged that he was not protected by prison officials, this court has recognized that an inmate who is injured as a result of a prison official's deliberate indifference to his safety may maintain a damage action for the deprivation of his civil rights under the Eighth and Fourteenth Amendments."  Snider v. Dylag, 188 F.3d 51, 54 (2d Cir. 1999) (internal quotation marks and citation omitted).  To that end, it has been found that an officer's affirmative actions that result in harm to an inmate may qualify as "obvious" indifference to that inmate's safety.  See id. at 55 (corrections officer's declaration of "open season" on an inmate in front of fellow prisoners was an "affirmative[]" announce[ment]" of his intention not to protect inmate from attack).  The Supreme Court has also made it clear that "'the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment.'"  Kinglsey v. Hendrickson, 135 S. Ct. 2466, 2473 (2015) (citing Graham v. Connor, 490 U.S. 386, 395 n.10 (1989)).

Plaintiff here alleges that Correction Officers Gordon, Jerrick and Thompson not only affirmatively provoked the May 13th incident, but also administered a chemical agent in response to the assault they had provoked, and then failed to properly decontaminate Plaintiff, subjecting him to "unnecessary and wanton infliction of pain."  (Am. Compl. ¶¶ 98, 103-06.) Taking Plaintiff's allegations as true, the conduct of these defendants violated clearly established rights of which a reasonable officer would have known – it would not require much reflection upon or training in the law to know that provoking a gang member who had threatened a pretrial detainee to attack said detainee, spraying the detainee with a chemical agent, and then denying him decontamination as required by protocol, all for the purpose of inflicting unnecessary pain in a wanton manner, is violative of the detainee's constitutional rights.  Thus, the Court finds that Defendants Gordon, Jerrick and Thompson are not entitled to dismissal of the claims against them on qualified immunity grounds at this juncture.

Failure to Protect Claims Against Correction Officers Gordon, Jerrick and Thompson

The Moving Defendants also seek the dismissal of Plaintiff's failure to protect claims against Defendants Gordon, Jerrick and Thompson based on the May 13th incident. "Prison officials have a duty to protect prisoners from violence at the hands of other prisoners." Farmer, 511 U.S. at 833 (internal quotations omitted).  A plaintiff can only prevail on a failure to protect claim where he shows that he has been incarcerated under conditions that pose "a substantial risk of harm" and that prison officials exhibited deliberate indifference to such harm. Farmer at 833-34, 37.  Although Farmer concerned Eighth Amendment claims brought by a

convicted prisoner in custody,[6] "[c]laims for deliberate indifference to a . . . serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."  Caiozzo, 581 F.3d at 72.[7]  The Moving Defendants assert that Plaintiff has not pleaded facts from which the Court can infer that he was incarcerated under conditions posing a substantial risk of harm, or that the named Defendants knew of, and disregarded of, such a risk.

   The viability of this claim as pleaded in the Amended Complaint is clear. Plaintiff alleges that the three Correction Officer Defendants observed a gang member threaten Plaintiff and turn away, and then caught the gang member's attention and taunted him in order to provoke the assault.  Plaintiff further alleges that the Defendants did not intervene until he had been punched ten times, and then exacerbated his injuries by using a chemical agent and denying him decontamination.  These allegations, taken as true, frame plausibly a cause of action for failure to protect.  The Correction Officers' antagonistic remarks to the unknown inmate are analogous to the types of acts previously recognized by the Second Circuit as "obvious" displays of deliberate indifference to a prisoner's safety.  See e.g., Snider, 188 F.3d at 55.  Accordingly,

---

[6]  The Eighth Amendment's proscription against cruel and unusual punishment pertains to convicted prisoners, while Fourteenth Amendment due process protections extend to pretrial detainees.  Caiozzo v. Koreman, 581 F.3d 63, 66 (2d Cir. 2009).

[7]  The Court notes that a recent decision by the United States Supreme Court, Kinglsey v. Hendrickson, held that a pretrial detainee's showing of objectively excessive force used deliberately is sufficient to establish a viable claim under the Fourteenth Amendment.  See 135 S. Ct. 2466 (2015).  This may have implications for the subjective element of the current deliberate indifference standard as applied to failure to protect against a substantial risk of harm. However, given that Plaintiff has alleged facts supporting the subjective prong as well as objective exposure to a substantial risk of harm, the Court need not engage the issue here.

the Court finds that the Plaintiff has adequately pleaded a failure to protect claim against

Defendants Gordon, Jerrick and Thompson based on the May 13th incident, and the Moving

Defendants' motion to dismiss this claim is therefore denied.


Section 1985 and 1986 Conspiracy Claims

        Plaintiff's Second Cause of Action alleges that a number of the Moving

Defendants conspired to deprive Plaintiff of his constitutional rights.  (See Am. Compl. ¶ 141.)

The Moving Defendants move to dismiss the Section 1985 and 1986 conspiracy claims against

these Defendants, arguing that Plaintiff's allegations of conspiracy are conclusory, and that

Plaintiff's conspiracy claims are barred by the intra-corporate conspiracy doctrine.  (Def. Memo

at p. 14.)

        To state a claim for conspiracy to commit a civil rights deprivation under 42

U.S.C. § 1985, a plaintiff must allege: (1) a conspiracy; (2) to deprive directly or indirectly any

person of equal protection of the laws, or of equal privileges and immunities; and (3) an act in

furtherance of the conspiracy; (4) whereby his person or property is injured or he is deprived of

any right of a U.S. citizen.  Mian v. Donaldson, Lufkin & Sec. Corp., 7 F.3d 1085, 1087-88 (2d

Cir. 1993) (citing United Bhd. of Carpenters, Local 610 v. Scott, 463 U.S. 825, 828-29 (1983)).

The conspiracy must be motivated by "some racial or perhaps otherwise class-based, invidious

discriminatory animus behind the conspirators' action."  Mian, 7 F.3d at 1088 (internal

quotations omitted).  In order to sustain such a claim, a plaintiff must "provide some factual

basis supporting a meeting of the minds, such that defendants entered into an agreement, express

or tacit, to achieve the unlawful end."  Webb v. Goord, 340 F.3d 105, 110 (2d Cir. 2003).

        Furthermore, "[u]nder the intracorporate conspiracy doctrine, officers, agents and

employees of a single corporate entity are legally incapable of conspiring together." Quinn v. Nassau Cnty. Police Dep't, 53 F. Supp. 2d 347, 359 (E.D.N.Y. 1999).  "[T]he Second Circuit has imported the doctrine into Section 1985 jurisprudence in this regard, and has dismissed a claim of conspiracy against officers and employees of a non-profit institution."  Id. at 360 (citing Hermann v. Moore, 576 F.2d 453 (2d Cir.), cert. denied, 439 U.S. 1003 (1978)).  "[A]n exception to the intracorporate conspiracy doctrine applies to individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity."  Id. (quoting Bond v. Board of Education of the City of New York, No. 97CV1337-NG, 1999 WL 151702, at *2 (E.D.N.Y. March 17, 1999)).

Plaintiff alleges that a conspiracy existed between Commissioner Bratton and Defendants Brown and Ortiz in which they falsified reports, filed false criminal charges and deliberately suppressed the truth about what occurred while Plaintiff was in NYPD custody. (See Am. Compl. ¶ 141-42.)  Plaintiff also alleges that Defendants Gordon, Jerrick and Thompson, along with Commissioner Ponte, conspired to "file, knowingly, false disciplinary reports, incident reports, and medical reports"  (id. ¶ 63), and to deprive Plaintiff "of his constitutional rights, including [] his right to be free from cruel and unusual punishment; to be free from the use of . . . excessive force; to be free from unreasonable delay and/or denial of medical attention; and to be free from harassment and intimidation.  (Am. Compl. ¶ 165.) However, Plaintiff has failed to plead that any action was taken by any of these Defendants based on an invidious discriminatory animus, which is a requirement of a Section 1985 claim. Furthermore, Plaintiff's Section 1985 conspiracy claims are barred by the intracorporate conspiracy doctrine, as he alleges that the respective conspiracies among the NYPD and DOC personnel were composed of members of the same organizations.  In addition, the actions of the

Defendants appear to have been committed in relation to their employment as NYPD and DOC officers and not for separate identifiable personal interests.  Accordingly, Plaintiff's Section 1985 conspiracy claims against the Moving Defendants must be dismissed.

Section 1986 only provides a cause of action against a person with the power to prevent a Section 1985 violation who has failed to do so, and a Section 1986 claim "must be predicated upon a valid [Section] 1985 claim."  Mian, 7 F.3d at 1088.  In light of the Court's dismissal of Plaintiff's Section 1985 claims, his Section 1986 claims against the Moving Defendants must also be dismissed.


ADA and Rehabilitation Act Claims Against the City and Commissioner Ponte

The Moving Defendants also seek the dismissal of Plaintiff's Seventh Cause of Action, which asserts claims for violations of the ADA and the Rehabilitation Act, as against the City and Commissioner Ponte.  The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C.S. § 12132 (LexisNexis 2009).  Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency."  29 U.S.C.S. § 794 (LexisNexis 2005).  "[T]he purposes of [the ADA and Rehabilitation Act] are to eliminate discrimination on the basis of disability and to ensure evenhanded treatment between the disabled and the able-bodied."  Doe v. Pfrommer, 148 F.3d 73, 82 (2d Cir. 1998) (citing

Southeastern Community College v. Davis, 442 U.S. 397, 410 (1979)).  While there are differences between the statutes, "unless one of those subtle distinctions is pertinent to a particular case, [courts in this Circuit] treat claims under the two statutes identically."  Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003).

To establish a violation of Title II of the ADA, a plaintiff must establish "(1) that he is a 'qualified individual' with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability."  Mary Jo C. v. New York State & Local Ret. Sys., 707 F.3d 144, 153 (2d Cir. 2013), cert. dismissed, 133 S. Ct. 2823 (2013).  To state a claim under the Rehabilitation Act, Plaintiff must satisfy the additional element of demonstrating that the defendant entity receives federal funding.  Harris v. Mills, 572 F.3d 66, 73-74 (2d Cir. 2010).  A qualified individual under the ADA is one "with a disability who, with or without reasonable modifications to rules, policies, or practices . . . or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." Mary Jo C., 707 F.3d at 144.  A disability within this statutory scheme is "a physical or mental impairment that substantially limits one or more major life activities," including "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, [and] concentrating."  42 U.S.C.S. § 12102 (LexisNexis 2009).  Persons within the scope of the protection of ADA and the Rehabilitation Act are entitled to reasonable accommodations to ensure that they have meaningful access to public benefits.  Powell v. National Bd. of Medical Examiners, 364 F.3d 79, 85 (2d Cir. 2004); Henrietta D., 331 F.3d at 273.

The Moving Defendants argue that Plaintiff has failed to allege any facts demonstrating that he was a qualifying individual as defined by either statute, or that he was denied the opportunity to participate in any services or programs as a result of his disability. (Def. Memo at p. 16.)  These arguments are unfounded.  As an initial matter, it is clear from the Amended Complaint that Plaintiff's broken jaw constituted a "qualifying disability," as Plaintiff has alleged that his condition impeded his ability to perform major life functions as required by the ADA, such as "his ability to breathe, speak, eat, run, and chew."  (Am. Compl. ¶ 122.) Furthermore, Plaintiff has sufficiently pleaded that he was denied access to services provided by the prison, insofar as he was denied "food capable of ingestion" (Plaintiff's Memorandum of Law in Opposition to Defendant's Partial Motion to Dismiss ("Pl. Memo") at p. 20), which is presumably provided to all inmates who do not suffer from a similar type of a disability.

Monetary recovery under the ADA against a state entity requires that a plaintiff "establish that the Title II violation was motivated by discriminatory animus or ill will based on the plaintiff's disability."  Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn, 280 F.3d 98, 111 (2d Cir. 2001).  "Government actions based on discriminatory animus or ill will towards the disabled are generally the same actions that are proscribed by the Fourteenth Amendment – i.e., conduct that is based on irrational prejudice or wholly lacking a legitimate government interest." Id.  Defendants assert that Plaintiff has failed to allege facts indicative of the requisite discriminatory animus.  (Def. Memo at p. 16.)  Plaintiff has, however, alleged that he was denied an edible diet and pain medication in contravention of medical orders (see Am. Compl. ¶ 121); no legitimate governmental interest in such treatment of a detainee is immediately apparent. Plaintiff's allegations are thus sufficient to plead plausibly a claim for  monetary damages under the ADA.

Plaintiff's ADA and Rehabilitation Act claims will, however, be dismissed as against Commissioner Ponte.  Plaintiff seeks damages, and neither statute provides for such claims against individuals, whether in their official or individual capacities.

New York State Law Intentional and Negligent Infliction of Emotional Distress Claims

Moving Defendants seek the dismissal of Plaintiff's intentional and negligent infliction of emotional distress claims against the City, Correction Officers Gordon, Jerrick and Thompson, and Commissioners Bratton and Ponte[8] on the grounds that Plaintiff has failed to sufficiently plead the requisite elements of either claim, and that recovery for such claims is barred because other remedial pathways for the Defendants' allegedly tortious conduct remain open.  (Def. Memo at p. 25.)

To state a claim for intentional infliction of emotional distress ("IIED") under New York law, a plaintiff must allege "[(1)] extreme and outrageous conduct; [(2)] intent to cause, or disregard of a substantial probability of causing, severe emotional distress; [(3)] a causal connection between the conduct and injury; and [(4)] severe emotional distress."  Howell v. New York Post Co., 81 N.Y.2d 115, 121 (1993).  To state a claim for negligent infliction of emotional distress ("NIED"), the cause of action must arise from conduct that "unreasonably endangers plaintiff's physical safety."  Glendora v. Gallicano, 206 A.D.2d 456 (2d Dep't 1994) (internal quotations omitted).  However, New York law explicitly bars recovery for negligent or intentional infliction of emotional distress when such claims are based on conduct that is "embraced by a traditional tort remedy."  E.E.O.C. v. Die Fliedermaus, 77 F. Supp. 2d 460, 472

---

[8]     The state law claims against Commissioners Bratton and Ponte, who are sued only in their official capacities, are duplicative of Plaintiff's Monell claims against the City and will therefore be dismissed.

(S.D.N.Y. Dec. 13, 1999) (quoting McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc., 256

A.D.2d 269 (1st Dep't 1998)); see also Druschke v. Banana Republic, Inc., 359 F. Supp. 2d 308,

315-16 (S.D.N.Y. 2005) (dismissing IIED and NIED claims due to the absence of "allegations of

injuries that may not be redressed through [plaintiff's] other causes of action.").

Plaintiff's state law claims include: (1) harassment, intimidation, assault and

battery; (2) conspiracy; (3) negligence; (4) violations of the State of New York Constitution,

Article 15 of the NYS Human Rights Law, Section 40 et seq. of the New York State Civil Rights

Law, the New York Corrections Law, and Sections 8-107 et seq., 8-502 et seq. and 8-603 et seq.

of the City Human Rights Law; (5) negligent hiring, training, supervision and retention; (6)

neglect and failure to provide medical treatment; (7) intentional and negligent infliction of

emotional distress; (8) failure to protect; (9) false arrest and false imprisonment; and (10) prima

facie tort.  (See Am. Compl. ¶¶ 233 et seq.)  Plaintiff presumably bases his IIED and NIED

claims against the City, Gordon, Jerrick and Thompson on incidents that occurred while Plaintiff

was in NYPD and DOC custody, including the assault by Defendant Brown and subsequent

denial of medical care, as well as the assault by the unknown inmate which resulted in the May

13th incident and the subsequent physical and emotional injuries suffered by Plaintiff.  These

emotional distress claims therefore appear to be based on the same conduct that constitutes the

basis for Plaintiff's state law claims for harassment, intimidation, assault and battery, failure to

protect, neglect and failure to provide medical treatment, and negligence.  Thus, because more

traditional tort remedies appear to be available to address his injuries, his IIED and NIED claims

must be dismissed.

<u>Plaintiff's Request for Leave to Amend</u>

   Plaintiff has requested leave to amend the Complaint for a second time in the event that the Court determines that he has failed to adequately plead one or more of his claims. (Pl. Memo at pp. 26-27.)  The undersigned's Individual Rules of Practice provide that, "[w]ithin seven (7) days after a motion pursuant to Rule 12(b)(6) or 12(c) is filed, the non-moving party must, by letter, filed on the ECF System, notify the moving party of its intent to amend the complaint as of right, make any request for leave to amend in response to the motion or state that it will file its opposition to the motion without further amendment."  <u>See</u> Individual Rules of Practice § A(2)(b)(iii).

   Plaintiff chose to oppose the motion rather than undertake further to amend, and he has made no proffer indicating that an amendment would not be futile.  <u>Cf.</u> <u>Lorelay Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC</u>, 797 F.3d 160, 190-91 (2d Cir. 2015).  The Court will permit Plaintiff to make a motion for leave to replead the dismissed claims.  Any such motion must be accompanied by a copy of the proposed Second Amended Complaint and must be filed by October 23, 2015.

CONCLUSION

For the reasons stated above, the Moving Defendants' motion to dismiss is granted insofar as it seeks the dismissal of: (1) Plaintiff's Section 1983 municipal liability claim as against the City insofar as it is based on action by the NYPD and its employees; (2) all claims as against Commissioner Bratton; (3) all claims as against Commissioner Ponte, without prejudice as to the litigation against the City; (4) all 1985 and 1986 conspiracy claims as against the Moving Defendants; and (5) Plaintiff's intentional and negligent infliction of emotional distress claims as against the Moving Defendants.  Moving Defendants' motion to dismiss is denied in all other respects.

Plaintiff is permitted to make a motion for leave to file a Second Amended Complaint addressing the deficiencies in his dismissed claims.  Any such motion must be filed by October 23, 2015, must be accompanied by the proposed amended complaint, and will be briefed in accordance with S.D.N.Y. Local Civil Rule 6.1  Courtesy copies of all papers must be provided for Chambers at the time of filing.

The initial pretrial conference in this case is scheduled for **October 30, 2015, at 10:15 a.m.**  The parties must consult with each other and make a joint submission in advance of the conference in accordance with the Initial Conference Order (docket entry no. 7).

This Memorandum Opinion and Order resolves docket entry no. 17.

SO ORDERED.

Dated: New York, New York
      September 29, 2015

                             /s/ Laura Taylor Swain
                             LAURA TAYLOR SWAIN
                             United States District Judge